

**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE FEB 0 6 2014

~~~~~ C. J.
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Feb. 6, 2014

Ronald R. Carpenter
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| LAWRENCE JAMETSKY, | ) | No. 88215-1 |
| Petitioner, | ) | |
| v. | ) | En Banc |
| RODNEY A. and JANE DOE OLSEN, MATTHEW and JANE DOE FLYNN, And MICHAEL and JANE DOE HABER, | ) | |
| Respondents. | ) | Filed **FEB 0 6 2014** |

GONZÁLEZ, J.—When Lawrence Jametsky lost his job during the fall of 2008, he feared foreclosure on his home. He already owed King County over $10,000 in back property taxes and had no foreseeable means of paying off the debt. Desperate to save his house, Jametsky sought help securing a loan. At the time, he had significant equity in his home and was willing to borrow against it. Through a series of connections, he was introduced to Matthew Flynn, a mortgage broker. Eventually, Flynn made Jametsky an offer. Jametsky was relieved; he thought Flynn was extending him a $100,000 loan that would cover his debts, save his house, and allow him to regain financial solvency. With this understanding, he agreed to the

transaction. The offer, however, was not what it seemed. Instead of receiving a loan, Jametsky deeded his house to Rodney Olsen for $100,000 and entered into an 18-month lease with a buy-back option.

After Jametsky realized what had happened months after the fact, he sought relief under the distressed property conveyances act (DPCA), chapter 61.34 RCW, among other things. His suit was dismissed at summary judgment. The Court of Appeals affirmed, finding that Jametsky's property was not distressed at the time of the sale because no certificate of delinquency had been issued by King County. *Jametsky v. Olsen*, noted at 171 Wn. App. 1019 (2012). We reverse the Court of Appeals, vacate the grant of summary judgment, and remand for further proceedings. We hold that a property can be distressed under RCW 61.34.020(2)(a) before a certificate of delinquency is issued and instruct the trial court to consider a variety of factors in making this factual determination.

## I. FACTS AND PROCEDURAL HISTORY

Jametsky inherited his grandfather's home and has been living there for over 25 years. Though there were liens on the house, the property was not mortgaged or otherwise encumbered. But, in the fall of 2008, Jametsky suffered significant financial and crushing personal hardships and he sought to borrow money against his house. Jametsky lost his job and was already struggling to pay his property taxes. He was two and a half years behind on his property tax payments, and without a steady

source of income he feared he could not cure the $10,000 delinquency in time to avoid foreclosure. Worst of all, in October 2008, Jametsky's teenage son was murdered.

Because of learning disabilities and limited education, Jametsky was unable to read or understand legal documents, and so he sought assistance with obtaining a loan. Michael Haber represented himself as someone who could help. He poured over Jametsky's financial and tax records and created a loan application that Jametsky never actually saw. Some months later, Haber came to Jametsky and introduced Flynn as an investor who was willing to assist. Haber and Flynn asked Jametsky about the existing liens and outstanding tax bill and assessed other financial records. One morning in October 2008, four days after Jametsky's son was murdered, they woke Jametsky and told him that they had a deal that would allow him to keep his home and pay off his debts. All Jametsky had to do was pay them back over time. Jametsky was relieved. In early November, they came back, roused Jametsky from bed, and drove him to a Starbucks to sign the paperwork. When Jametsky asked what the papers were for, he was told that they were for a loan. Jametsky signed.

Without knowing it at the time, Jametsky deeded his house to Olsen for $100,000. Due to Jametsky's outstanding obligations and inflated fees, Jametsky only received $4,697 from the transaction even though his house was estimated to be worth $230,000. Flynn and Haber, on the other hand, received $7,000 and $3,000 respectively in commission.

For some time, Jametsky made what he thought were loan payments to Olsen. These were, however, under the documents Jametsky signed at Starbucks, rental payments. The record is not entirely clear on the exact sequence of subsequent events. But, over a year after the transaction, Olsen began sending eviction notices to Jametsky, alleging nonpayment of rent and a failure to vacate at the end of the lease term. Around the same time, Jametsky learned that he did not receive a loan, but instead he had deeded his home to Olsen.

In July 2010, Jametsky filed a complaint seeking to quiet title and alleging violations of DPCA, unfair and deceptive practices, and a civil conspiracy. The trial court found there were no genuine issues of material fact and granted Olsen's motion for summary judgment in its entirety. The trial judge found that Jametsky's home did not meet the definition of "distressed property" under the DPCA because no certificate of delinquency for unpaid property taxes had been issued by King County. Because claims of unfair and deceptive practices under the Consumer Protection Act, chapter 19.86 RCW, were based on the alleged DPCA violations, these claims were dismissed as a result of that determination as well. Finally, Jametsky's civil conspiracy claim failed due to insufficient evidence of any communication among the parties. The Court of Appeals affirmed. We granted review and now reverse.

## II. ISSUE

Must a certificate of delinquency be issued before a property is considered distressed under RCW 61.34.020(2)(a)?

4

## III. ANALYSIS

### A. Standard of Review

Statutory interpretation is a question of law reviewed de novo. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002) (citing *State v. Breazeale*, 144 Wn.2d 829, 837, 31 P.3d 1155 (2001); *State v. J.M.*, 144 Wn.2d 472, 480, 28 P.3d 720 (2001)). The goal of the inquiry is to ascertain and carry out the legislature's intent. *Id.*

If possible, we "must give effect to [the] plain meaning [of a statute] as an expression of legislative intent." *Id.* at 9-10. This plain meaning is derived from the context of the entire act as well as any "related statutes which disclose legislative intent about the provision in question." *Id.* at 11. Because "'[p]lain language does not require construction,'" we need not consider outside sources if a statute is unambiguous. *State v. Delgado*, 148 Wn.2d 723, 727, 63 P.3d 792 (2003) (quoting *State v. Wilson*, 125 Wn.2d 212, 217, 883 P.2d 320 (1994)).

A statute is ambiguous when, after examination, we find "that it is subject to more than one reasonable interpretation." *City of Seattle v. Winebrenner*, 167 Wn.2d 451, 456, 219 P.3d 686 (2009) (citing *State v. Jacobs*, 154 Wn.2d 596, 600-01, 115 P.3d 281 (2005)). At that point, we "may resort to statutory construction, legislative history, and relevant case law for assistance in discerning legislative intent." *Christensen v. Ellsworth*, 162 Wn.2d 365, 373, 173 P.3d 228 (2007).

B. The DPCA Applies Only to Transactions Involving "Distressed Homes" or "Distressed Homeowners"

The DPCA's protections are reserved for desperate circumstances that may induce homeowners into unscrupulous deals. But these additional procedural safeguards are afforded only to transactions involving "distressed homes" or "distressed homeowners." *See, e.g.,* RCW 61.34.050, .060, .070, 080. The act defines distressed homes as dwellings that are either (1) "in danger of foreclosure or at risk of loss due to nonpayment of taxes" or (2) "in danger of foreclosure or . . . in the process of being foreclosed due to a default under the terms of a mortgage." RCW 61.34.020(2)(a)-(b). While the definition section expressly defines "in danger of foreclosure,"[1] there is no corollary for "at risk of loss due to nonpayment of taxes." *See* ch. 61.34 RCW. Nonetheless, the plain meaning of RCW 61.34.020(2)(a) is clear. The act is remedial, and we construe remedial statutes liberally in accordance with the

---

[1] Under the statute:

(11) "In danger of foreclosure" means any of the following:

(a) The homeowner has defaulted on the mortgage and, under the terms of the mortgage, the mortgagee has the right to accelerate full payment of the mortgage and repossess, sell, or cause to be sold, the property;

(b) The homeowner is at least thirty days delinquent on any loan that is secured by the property; or

(c) The homeowner has a good faith belief that he or she is likely to default on the mortgage within the upcoming four months due to a lack of funds, and the homeowner has reported this belief.

RCW 61.34.020.

legislative purpose behind them. *Int'l Ass'n of Fire Fighters v. City of Everett*, 146 Wn.2d 29, 34, 42 P.3d 1265 (2002) (citing *Gaglidari v. Denny's Rests., Inc.*, 117 Wn.2d 426, 450-51, 815 P.2d 1362 (1991)). Accordingly, a trial court must conduct a factual inquiry and consider a variety of factors when determining whether a property is distressed because it is "at risk of loss due to nonpayment of taxes."

## 1. *RCW 61.34.020(2)(a) is not ambiguous*

We find the plain meaning of "at risk of loss due to nonpayment of taxes" unambiguous because it is not subject to more than one reasonable interpretation. Nothing in the DPCA or any related statute contradicts or obfuscates the plain meaning of the phrase. Furthermore, neither party contends that the relevant portion of the DPCA is ambiguous. The parties dispute only the plain meaning of the "at risk of loss" and whether RCW 84.64.050 is a related statute for purposes of that determination.

Respondents argue for a bright-line rule. They believe that a dwelling only becomes a distressed property under RCW 61.34.020(2)(a) once the county treasurer has issued a certificate of delinquency under RCW 84.64.050 of the lien foreclosure act. Jametsky and the attorney general[2] contend that construing the statute in this way

---

[2] The attorney general appears in this matter as an amicus. It is well established that "[w]here an agency is charged with the administration and enforcement of a statute, the agency's interpretation of an ambiguous statute is accorded great weight in determining legislative intent." *Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n*, 123 Wn.2d 621, 628, 869 P.2d 1034 (1994) (emphasis omitted). The DPCA is a consumer protection statute and "[t]he Attorney General is charged with the administration and enforcement of the . . . Consumer Protection

undermines the legislative intent of the DPCA. They contend that "at risk" should be given its plain, dictionary meaning and that RCW 84.64.050 is not a related statute for purposes of statutory interpretation. We agree with Jametsky and the attorney general.

### 2. *The DPCA is a remedial statute that must be construed liberally*

The DPCA is a remedial statute that protects vulnerable homeowners from equity skimming and other fraudulent and predatory schemes. *See* RCW 61.34.010.[3] Its remedial nature permeates the chapter. The act makes a willful pattern of equity skimming a class B felony. RCW 61.34.030. In establishing that *any* violation of the DPCA is "an unfair method of competition" for the purposes of the Consumer Protection Act, the legislature found "the practices covered by [the DPCA] are matters vitally affecting the public interest." RCW 61.34.040(1). As further evidence of its remedial purpose, courts may impose up to $100,000 in exemplary damages for bad faith violations of the DPCA. RCW 61.34.040(2).

---

Laws of the state of Washington." *Gold Seal Chinchillas, Inc. v. State*, 69 Wn.2d 828, 833, 420 P.2d 698 (1966).

[3]The legislature finds that persons are engaging in patterns of conduct which defraud innocent homeowners of their equity interest or other value in residential dwellings under the guise of a purchase of the owner's residence but which is in fact a device to convert the owner's equity interest or other value in the residence to an equity skimmer, who fails to make payments, diverts the equity or other value to the skimmer's benefit, and leaves the innocent homeowner with a resulting financial loss or debt.

The legislature further finds this activity of equity skimming to be contrary to the public policy of this state and therefore establishes the crime of equity skimming to address this form of real estate fraud and abuse.

RCW 61.34.010.

We construe remedial consumer protection statutes, such as the DPCA, liberally in favor of the consumers they aim to protect. *Carlsen v. Global Client Solutions, LLC*, 171 Wn.2d 486, 498, 256 P.3d 321 (2011) ("[A]s a remedial statute enacted to stem the 'numerous unfair and deceptive practices' rife in the growing debt adjustment industry, the debt adjusting statute should be construed liberally in favor of the consumers it aims to protect." (quoting *Performance Audit: Debt Adjusting, Licensing and Regulatory Activities*, Report No. 77-13, at 7 (Jan. 20, 1978) (on file with Wash. State Archives, H.B. 86) (1979))); *State v. Pike*, 118 Wn.2d 585, 591, 826 P.2d 152 (1992) ("[C]onsumer protection statutes like [the automotive repair act (ARA)] have been adopted 'to foster fair dealing . . . in a trade which [has] been replete with frequent instances of unscrupulous conduct.' As a remedial statute, the ARA is to be liberally construed to further this legislative purpose." (fourth alteration in the original) (citation omitted) (quoting *I-5 Truck Sales & Serv. Co. v. Underwood*, 32 Wn. App. 4, 11, 645 P.2d 716 (1982))). Because of this, "at risk of loss" must be construed to offer homeowners more rather than less protection. And so, a certificate of delinquency need not issue for a property to be deemed distressed under RCW 61.34.020(2)(a).

*3. RCW 84.64.050 is not a related statute*

Respondents offer RCW 84.64.050 as evidence that the legislature intended a narrow definition of "distressed property" in the context of potential tax foreclosures. But we consider only those extrinsic statutes "which disclose legislative intent about

9

the provision in question." *Campbell & Gwinn*, 146 Wn.2d at 11. RCW 84.64.050 sheds little light on the legislative intent of the DPCA, and so we reject respondents' position and find that this statute does not define "at risk of loss due to nonpayment of taxes." The stated legislative intent of the DPCA is to protect innocent homeowners from equity skimming and other misconduct that contravenes public policy. *See* RCW 61.34.010. Nothing contained in RCW 84.64.050 relates to that legislative intent.[4] Chapter 84.64 RCW pertains exclusively to the procedures related to tax foreclosure and redemption, not remedies afforded defrauded homeowners. *See* ch. 84.64 RCW.

Furthermore, "[t]he legislature is presumed to enact laws with full knowledge of existing laws." *Thurston County v. Gorton*, 85 Wn.2d 133, 138, 530 P.2d 309 (1975). Mindful of this principle, we find the absence of any reference to RCW 84.64.050 anywhere in RCW 61.34.020 or the DPCA as a whole telling. Other related statutes, such as mortgage and real estate broker licensing statutes and those defining "financial institutions," were explicitly cited by legislature in the DPCA. *See* RCW 61.34.020(3)(a)(ix), .020(3)(a)(x), (3)(b), (8), (9), (11)(c). Thus, the legislature's failure to cite RCW 84.64.050 in a statute replete with external references

---

[4] The relevant portion of the statute reads, "After the expiration of three years from the date of delinquency, when any property remains on the tax rolls for which no certificate of delinquency has been issued, the county treasurer must proceed to issue certificates of delinquency on the property to the county for all years' taxes, interest, and costs." RCW 84.64.050(1).

cannot be viewed as accidental and further supports our conclusion that it is not relevant for defining "at risk of loss due to nonpayment of taxes."

*4. The plain meaning of RCW 61.34.020(2)(a)*

To resolve the question presented, we give the operative term "at risk" its plain, dictionary definition of "vulnerable," which comports with the common understanding of the phrase and its use by the legislature in other statutory schemes.[5] Though we recognize this interpretation may have practical difficulties, it is faithful to the legislature's intent and we have no doubt that trial courts are well equipped to conduct the requisite case-specific factual inquiries to determine whether a property is sufficiently "at risk" to be characterized as distressed.

Without a doubt, case-by-case determinations require more effort. But such flexibility is the only way "at risk of loss due to nonpayment of taxes" can be determined fairly. More solvent individuals with adequate resources and an ability to

---

[5] Though *Merriam-Webster's Third International Dictionary* does not define the term "at risk," other sources provide satisfactory alternatives. "At risk" can be defined as "exposed to a usu[ally] specified danger or loss." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1011 (10th ed. 1993). Alternatively, "at risk" can also be defined as "[i]n an endangered state." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1514 (5th ed. 2011). Perhaps the most apt idiomatic definition for "at risk" is "vulnerable; likely to be lost or damaged." COLLINS ENGLISH DICTIONARY, *available at* http://www.collinsdictionary.com/dictionary/english/at-risk (last visited Jan. 31, 2014). These are all acceptable definitions that are in accord with a commonsense understanding of the term.

Furthermore, these definitions are consistent with the legislature's use of "at risk" as a term of art in other statutes. *See, e.g.,* RCW 43.185C.210(1) ("The transitional housing operating and rent program is created to assist individuals and families who are homeless or who are at risk of becoming homeless. . . ."), RCW 28A.175.145(2)(g) ("[o]utreach and counseling targeted to students identified as at risk of dropping out of school"), RCW 74.41.030(3) ("'Eligible participant . . .' means an adult who needs substantially continuous care or supervision by reason of his or her functional disability and may be at risk of placement into long-term care facility.").

11

secure credit may not be "at risk of loss" until their tax default has reached a more advanced stage. Others, who have lost income or experienced some financial hardship, may be "at risk of loss" earlier in the process. By considering and balancing a variety of non-exclusive factors, such as (1) the total amount owed to the county including all fees and other costs; (2) the total number of payments the delinquency represents and when foreclosure could occur; (3) the financial ability of the homeowner to meet or cure this obligation at the time of the transaction;[6] and (4) any discrepancy between the sale price and the fair market value of the property, trial courts will be able to accurately conclude whether a distressed property was conveyed and whether the protections of the DPCA apply to the transaction in question. That said, this basic framework should be viewed as a starting point and does not purport to account for unique factors and circumstances that may exist in certain cases. Therefore, trial courts faced with deciding whether a property is distressed as a result of a property tax delinquency must, at the very least, begin their analysis with this inquiry.

## IV. CONCLUSION

RCW 84.64.050 is not a related statute for purposes of construing the plain meaning of RCW 61.34.020(2)(a) and a property can be "at risk of loss due to nonpayment of taxes" before a certificate of delinquency has been issued. We vacate

---

[6] This calculation can be based on income, savings, and credit worthiness and take other financial obligation into account.

12

the decisions of the lower courts and remand the case for further proceedings consistent with this opinion.

González, J.

WE CONCUR:

Madsen, C.J.

McJ_____

Step, J.

Wiggins, J.

Fairhurst, J.

Geo. M____, J.