# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| DRP HOLDINGS, LLC and KEANLAND PARK HOMEOWNERS' ASSOCIATION, | No. 49886-3-II |
| Appellants, | |
| v. | UNPUBLISHED OPINION |
| THURSTON COUNTY, | |
| Respondent. | |

SUTTON, J. — DRP Holdings, LLC and the Keanland Park I Homeowners' Association (collectively DRP) appeal the Thurston County Board of Health's (Board) land use decision requiring effluent sampling as a condition of DRP's application for operational certificates for on-site sewage systems (OSS) they proposed in DRP's development. DRP argues that the imposition of the effluent sampling requirements violates state vesting laws. We disagree with DRP's vesting argument because Thurston County's Environment Health Division (EHD) had the authority to impose additional effluent testing requirements under the law in effect when the plat vested. Accordingly, we affirm the Board's decision that EHD had the authority to impose effluent testing requirements as a condition of DRP's OSS operational certificates.

## FACTS

On June 9, 2008, DRP received preliminary plat approval for a 98 lot subdivision in unincorporated Thurston County—Keanland Park I. During the platting process for the subdivision, there was a disagreement between DRP and EHD about how to calculate the impact of nitrogen on various surface water resources. However, the parties agreed that by using nitrate

reduction technology with the OSS would resolve any problems. The parties' agreement was summarized in a 2008 letter from DRP's attorney, stating in part:

> The Applicant has proposed use of enhanced treatment proprietary on-site septic systems for all 99 lots to mitigate potential impacts of the development to the adjacent wetlands. Notwithstanding Ms. Romero's[1] disagreement with the Applicant with respect to proper assumptive values used in the nitrate loading calculation, the Applicant and Environmental Health were both able to agree that the project appears to satisfy all relevant County assimilative capacity standards for nitrate loading with use of enhanced treatment septic systems. County policy does not preclude use of proprietary systems to achieve compliance with assimilative capacity standards so long as the Applicant understands that (1) *compliance with all state and local rules regarding use and permitting of proprietary septic systems will occur at time of permitting*, and (2) there is therefore some risk to the Applicant that the proposed technology might change or increase in cost between the time the plat is approved and requisite permits are applied for.

Administrative Record (AR) at 226 (emphasis added).

During the hearing on preliminary plat approval before a hearing examiner, the Black Hills Audubon Society objected to the plat approval and requested that additional effluent testing requirements be imposed on the OSS. EHD staff at the preliminary hearing did not take any position on the request to impose additional effluent testing requirements on the OSS. The hearing examiner for the preliminary plat approval declined to impose additional effluent testing conditions.

The final plat for Keanland Park I was approved on July 15, 2015, and contained the following plat note 16:

> Nitrate treatment devices registered by the Washington State Department of Health shall be incorporated for each on-site sewage system design. The Homeowners' Association shall be responsible for hiring a single certified monitoring specialist to monitor and maintain the on-site sewage systems within the subdivision. Sewage system service contracts between each lot owner and the homeowners' association

---

[1] Ms. Nadine Romero is the EHD hydrogeologist.

certified monitoring specialist will be required prior to sewage system permit issuance. *Operation and maintenance certificates, which specify the maintenance and monitoring requirements for each sewage system, will be required at the time of sewage system final construction approval, and shall be renewed in accordance with the provisions of Article IV.*

AR at 104 (emphasis added).

After DRP began applying for OSS installation permits, EHD sent DRP a letter containing the conditions for operational certificates for the OSS, including the following:

4. The CMS [Certified Monitoring Specialist] shall prepare a plan that shows that approximately one-third of the built systems serving occupied homes in Keanland Park will be sampled each year and that each system will be sampled at least every three years.

5. The CMS shall sample effluent from the discharge end of the nitrogen-reduction component at least once every 3 years.

6. The effluent shall meet the following conditions: TN: ≤ 30 mg/L

7. If the total nitrogen geometric mean **for all the sample results** in Keanland Park from that year exceeds the effluent limit by 25% (TN > 37.5 mg/L) then the individual systems that are not meeting the standard of 37.5 mg/l shall sample both the influent and effluent.

> a. If the system is reducing the Total Nitrogen concentration by at least 50%, then the system will be considered to be performing as designed.
>
> b. If the system is reducing the Total Nitrogen concentration by less than 50%, the CMS will submit a written report of actions taken or proposed to bring the system performance back within the required limits.
>
> c. Systems that require corrective action due to elevated effluent nitrogen concentrations must be re-sampled to evaluate system performance.
>
> d. Systems that reduce effluent nitrogen concentrations by 50% or more after correction will be categorized as meeting the reduction requirements.

AR at 35-36. The effluent testing requirements were based on Thurston County permitting policy ONST.08.POL.606, approved on July 18, 2008.

3

DRP appealed EHD's letter to a hearing officer. DRP objected to conditions 4-7 concerning effluent testing. At the hearing, DRP argued that the additional conditions concerning effluent testing exceeded the scope of the conditions included in the preliminary and final plat approvals for Keanland Park I and therefore violated state vesting laws. The parties agreed that the Keanland Park I project vested under the 1995 WACs and the 1999 Sanitary Code for Thurston County (Sanitary Code).

The hearing officer concluded that

> [the 1995 WACs and 1999 Sanitary Code] both authorize the local health officer to require monitoring of proprietary systems. The "policy" in place at the time of vesting was that monitoring of a given on-site septic system is determined at time of operational certificate issuance pursuant to authority conferred in Section 16. No violation of state vesting doctrine is shown.

AR at 497-98. The hearing officer affirmed EHD's letter imposing effluent testing conditions.

DRP appealed the hearing officer's decision to the Board. In its decision, the Board stated, in part:

> After a careful review of the Hearing Officer's decision, and the record, the Board agrees with the Hearing Officer's conclusions that at the time these projects vested, the 1995 version of WAC 264-272-02011 and -04011 and the 1999 Thurston County Sanitary Code section 16.2 clearly authorized the health officer to require the type of monitoring of the proprietary systems challenged in this case. And that the monitoring of a given system is determined at time of operational certificate issuance pursuant to authority in section 16.

AR at 624-25. The Board affirmed the hearing officer's decision.

DRP filed a land use petition in Lewis County Superior Court for review of the Board's decision. The superior court affirmed the Board's decision. DRP appeals.

ANALYSIS

I. LEGAL STANDARDS

The Land Use Petition Act (LUPA), chapter 36.70C RCW, governs judicial review of land use decisions. *Whatcom County Fire Dist. No. 21 v. Whatcom County*, 171 Wn.2d 421, 426, 256 P.3d 295 (2011). We stand in the same position as the superior court and we apply the standards set forth in RCW 36.70C.130(1) to the agency's administrative record. *Dep't of Transp. v. City of Seattle*, 192 Wn. App. 824, 836, 368 P.3d 251 (2016). We grant relief only if the party challenging the administrative decision satisfies the burden of establishing that one of six statutory standards has been met by a preponderance of the evidence:

> (a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
>
> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
>
> (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
>
> (d) The land use decision is a clearly erroneous application of the law to the facts;
>
> (e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
>
> (f) The land use decision violates the constitutional rights of the party seeking relief.

RCW 36.70C.130(1)(a)-(f).

DRP argues that it is entitled to relief because the Board's decision is an erroneous interpretation of the law, RCW 36.70C.130(1)(b), the Board's decision is not supported by substantial evidence, RCW 36.70C.130(1)(c), and the Board's decision is a clearly erroneous application of the law to the facts, RCW 36.70C.130(1)(d).

Review under RCW 36.70C.130(1)(b) is a question of law that we review de novo. *Whatcom County*, 171 Wn.2d at 426. Under RCW 36.70C.130(1)(c), we review the facts and inferences in the light most favorable to the party that prevailed in the highest fact-finding forum and ask whether there is a sufficient quantum of evidence in the record to persuade a reasonable person of the truth of the declared premise. *Phoenix Dev., Inc. v. City of Woodinville*, 171 Wn.2d 820, 828-29, 256 P.3d 1150 (2011). Under RCW 36.70C.130(1)(d), an application of the law to the facts is clearly erroneous if, after reviewing all the evidence, we are left with the definite and firm conviction that a mistake has been committed. *Whatcom County*, 171 Wn.2d at 427.

## II. RCW 36.70C.130(1)(b)–MISINTERPRETATION OF THE LAW

DRP argues that the Board's decision was a misinterpretation of the law because the Board's decision is contrary to state vesting law. Based on article IV, section 16.2 of the 1999 Sanitary Code, EHD did have the authority to impose the effluent testing requirements on the OSS operational certificates. Accordingly, the Board's decision did not misinterpret the law and we affirm the Board's decision.

Washington's vested rights doctrine employs a "'date certain'" standard for vesting. *Snohomish County v. Pollution Control Hrg's Bd.*, 187 Wn.2d 346, 358, 386 P.3d 1064 (2016), *as amended*, (2017) (quoting *Town of Woodway v. Snohomish County*, 180 Wn.2d 165, 172, 322 P.3d 1219, *remanded*, 2014 WL 6968436 (2014)). The vested rights doctrine originated at common law, but it is now statutory. *Snohomish County*, 187 Wn.2d at 358. RCW 58.17.033(1) and RCW 58.17.170 codify the state vesting laws for plats and subdivisions.

DRP asserts that "this dispute centers on an application of state vesting law with respect to subdivisions." Br. of Appellant at 15 (citing RCW 58.17.033, .170). However, DRP

mischaracterizes the issue in this case because the parties agree that the plat vested under the 1995 WACs and the 1999 Sanitary Code, and the Board applied the 1995 WACs and 1999 Sanitary Code in its decision. Therefore, this is not an issue of what law applies under the state vesting statutes. Instead, DRP's issue is with the scope of authority conveyed to EHD under those laws.

Article IV, section 16 of the 1999 Sanitary Code provides, in relevant part,

> 16.2 The health officer shall:
>
>> 16.2.1 Establish recommended conditions, monitoring schedules and reporting schedules to assure proper on-going operation and maintenance for all OSS. The conditions and monitoring schedules will vary depending on the type of system, the location of the system, population or facility(ies) served, the sensitivity of the site, and requirements within alternative system guidelines.
>>
>> . . . .
>
> 16.3 Operational Certificates shall be required for certain large or complex OSS. These include experimental, community, large OSS, proprietary devices which require third party maintenance. . . .
>
>> . . . .
>>
>> 16.3.4 The Health Officer will establish conditions, monitoring schedules and reporting schedules to assure proper on-going operation and maintenance for OSS with an operational certificate.

AR at 396-97. An operational certificate "shall contain conditions for the operation, maintenance, and monitoring" of the OSS. AR at 357.

Statutory interpretation is a question of law that we review de novo. *Jametsky v. Olsen*, 179 Wn.2d 756, 761, 317 P.3d 1003 (2014). The primary goal of statutory interpretation is to determine and give effect to the legislature's intent. *Jametsky*, 179 Wn.2d at 762. We first look

to the plain language of the statute. *Jametsky*, 179 Wn.2d at 762. If a statute is unambiguous, we apply the statute's plain language as an expression of legislative intent without considering other sources. *Jametsky*, 179 Wn.2d at 762.

DRP argues that EHD did not have the authority to impose effluent testing requirements under article IV, section 16.2 of the 1999 Sanitary Code.[2] We disagree.

DRP argues that article IV, section 16.2 of the 1999 Sanitary Code does not grant EHD the authority to impose whatever conditions it wants on OSS operational certificates. However, DRP does not point to anything that restricts EHD's authority to do so under article IV, section 16.2 of the 1999 Sanitary Code or under article IV, section 16.3 of the 1999 Sanitary Code. The authorization in article IV, section 16.2.1 of the 1999 Sanitary Code to establish monitoring conditions for OSS is without qualification. Similarly, the authorization in article IV, section 16.3.4 of the 1999 Sanitary Code to establish monitoring conditions for OSS with operational certificates is without qualification. The effluent testing requirements are consistent with conditions that could be imposed under article IV, section 16 of the 1999 Sanitary Code.

DRP seems to make the circular argument that, because article IV, section 16.2 of the 1999 Sanitary Code applies to the plat, and the plat already contains certain conditions, the only conditions that can be imposed under article IV, section 16.2 of the 1999 Sanitary Code are the conditions contained in the plat. But this argument disregards the last sentence of plat note 16, which explicitly reserves decisions on operational certificates for individual OSS. Therefore, the

---

[2] Because we hold that EHD's authority arises from section 16, we do not address DRP's argument that EHD lacked authority to impose effluent testing conditions under article IV, section 5.2 of the 1999 Sanitary Code.

plat condition does not limit the conditions that can be imposed on operational certificates under section 16.

We affirm the Board's decision because EHD had the authority to impose the conditions under the 1999 Sanitary Code.

### III. DRP'S ADDITIONAL ARGUMENTS

DRP makes several additional arguments that we decline to reach because they relate to matters that were not the basis of the Board's decision and, therefore, are not grounds for reversing the Board's decision. Specifically, DRP argues that EHD is not entitled to agency deference and that we should not rely on the language in the 2008 letter.

### A. DEFERENCE

DRP also argues that

the Board's decision affirming the Hearing Officer's deference to EHD, as further affirmed by the Superior Court, is not supported by substantial evidence in the record and is an erroneous interpretation of the standards for deference to an agency's realm of authority.

Br. of Appellant at 31. Although DRP argues the findings are not supported by substantial evidence, it fails to assign error to any findings of fact, and instead it disputes the legal conclusion that EHD is entitled to deference in its interpretation of its authority under the 1999 Sanitary Code.

However, the Board did not provide any deference to EHD. The Board based its decision affirming the hearing officer's decision on the purely legal conclusion that article IV, section 16.2 of the 1999 Sanitary Code authorized the effluent testing requirements. Nor was it necessary to give deference to the EHD in order to reach this conclusion. Therefore, whether EHD is entitled to deference here is not grounds for reversing the Board's decision.

B.  RELIANCE ON THE 2008 LETTER

DRP also argues that the language in the 2008 letter is irrelevant to the resolution of this case.  We agree.  However, because the Board did not indicate that it relied on the language in the 2008 letter in reaching its decision, the relevance of the 2008 letter does not influence our review of the Board's decision.  However, we do note that, while not legal grounds for affirming the Board's decision, the language of the 2008 letter clearly evidences DRP's acknowledgment that additional conditions *could* be imposed later during the permitting process for the OSS.

CONCLUSION

The Board did not misinterpret article IV, section 16 of the 1999 Sanitary Code and it properly concluded that the EHD had the authority to impose the effluent testing conditions on DRP's OSS operational certificates.  Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Sutton, J.

We concur:

Johanson, J.

Maxa, A.C.J.