# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| VIKING JV, LLC, | No. 56803-9-II |
| Respondent, | |
| v. | |
| CITY OF PUYALLUP, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J. – Viking JV, LLC (Viking) spent $2.6 million constructing and installing sewer facilities to extend the City of Puyallup's sewer service to the property on which Viking built a warehouse. The price of the construction was $3.2 million, but Viking received a $600,000 contribution from a neighboring property owner, Franklin Puyallup, LLC (Franklin), leaving Viking to cover the remaining $2.6 million in construction costs for installing the facilities. Viking sought a latecomer contract from the city pursuant to RCW 35.91.020, which allows a developing property owner who installs water or sewer facilities to be partially reimbursed for construction costs when other property owners connect to the facilities. Because Puyallup had credited $253,000 in sewer connection fees to Franklin, the city claimed that the money it credited to Franklin passed through to Viking as a contribution because Franklin gave Viking $600,000 toward the construction of the sewer line and facilities. Based on this passthrough contribution theory, Puyallup excluded itself from an obligation to pay a pro rata reimbursement to Viking under the latecomer contract the city drafted.

No. 56803-9-II

After the city council approved the latecomer contract, Viking filed a lawsuit challenging Puyallup's decision to exclude itself from any payment obligation under the contract. Viking's complaint included a LUPA petition in the alternative, should the trial court determine that LUPA was the exclusive means of review of the city's decision. Puyallup filed a motion for summary judgment, arguing that LUPA was the exclusive means of review and that Viking failed to comply with LUPA's procedural requirements. Puyallup further argued that Viking was not entitled to a latecomer contract under the relevant statute and that, even if it was, Puyallup should not be obligated to pay latecomer fees due to its credit of connection fees to Franklin, who contributed $600,000 toward the construction costs. Puyallup also later argued that the contract should be returned to the city council for correction of some numbers that the city engineer found were incorrect. The trial court denied summary judgment to Puyallup and later granted summary judgment to Viking. Puyallup appeals the trial court's orders on summary judgment.

We hold that Puyallup's arguments are without merit and affirm the trial court's orders denying summary judgment to Puyallup and granting summary judgment to Viking.

FACTS

I. BACKGROUND ON LATECOMER REIMBURSEMENT CONTRACTS

Chapter 35.91 RCW is the Municipal Water and Sewer Facilities Act. "The act provides a process through which a property owner who funds [ ] construction or improvement [of water facilities or sewer systems] . . . can obtain reimbursement for their costs from other property owners who later connect to or use the water or sewer facilities." *Cave Props. v. City of Bainbridge Island*, 199 Wn. App. 651, 657, 401 P.3d 327 (2017). "The reimbursement amounts collected from other property owners are called 'latecomer fees.' " *Id.* (quoting RCW 35.91.015(1)).

2

Municipalities are required by statute to contract with a developing property owner "for the construction or improvement of water or sewer facilities that the owner elects to install solely at the owner's expense" when the municipality's ordinances require construction of the facilities "as a prerequisite to further property development." RCW 35.91.020(1)(a). The statute further provides that the developing property owner must submit a request for a latecomer reimbursement contract to the municipality prior to approval of the water or sewer facility by the municipality. *Id.* Such a contract must provide for pro rata reimbursement to the developing owner for a portion of the costs of the construction of the sewer facilities. RCW 35.91.020(2)(b). These reimbursements come from "latecomer fees received by the municipality from property owners who subsequently connect to or use the water or sewer facilities, but who did not contribute to the original cost of the facilities." RCW 35.91.020(2)(c).

The Puyallup Municipal Code (PMC) similarly provides for reimbursements to property owners who extend the city's sewer services, collected from "noncontributing property owners" when these property owners connect to the sewer facilities. PMC 14.20.030. Under the city's procedure, once the extension is complete, the developing property owner is required to submit a notarized cost breakdown to the city engineer. PMC 14.20.040. The city engineer then prepares an assessment roll detailing the total area of property paying or sharing the costs of constructing the sewer main, the total area of the property that may be served by the proposed line, and the names and addresses of all property owners that fall into the above categories. PMC 14.20.040(1)(a)-(c). This information is then forwarded to the city council and all property owners on the assessment roll, along with an estimate of the pro rata costs to each property owner for connecting to the sewer main. PMC 14.20.040(2). The city council then holds a public hearing, after which the city council

"may enter into a contract between the city and the property owners paying the cost of the extension." *Id.*

## II. AGREEMENTS REGARDING INSTALLATION OF SEWER FACILITIES

Viking has constructed a warehouse on property it owns in Puyallup. Because there was no existing city sewer infrastructure at the site, Viking installed sewer facilities, including a lift station and main lines, to serve the property.[1] These facilities would not only serve Viking's property, but would also serve several nearby properties that could connect to the facilities.

Franklin was constructing a shopping center around the same time that Viking was constructing its warehouse. Franklin's development also necessitated construction of sewer facilities. Viking entered into an agreement with Franklin in 2017 concerning the construction of

---

[1] The Mitigated Determination of Non-Significance (MDNS) issued by the city states:

> *There is no existing City sewer infrastructure serving the project site and surrounding area, thus constituting a potentially significant impact given potential future sewer needs of the site and vicinity under current zoning.* Based upon a review of project/sub-basin sewer generation relative to City sewer facilities plans, a preferred alignment and scope of sewer infrastructure to serve this site has been identified. Specifically, a technical memorandum ("Analysis for East Valley Sewer Service Area," BHC Consultants, 11/13/14) documents the prescribed sewer infrastructure necessary to adequately connect this project site with the prescribed downstream sewer system, as consistent with City utility plans. In sum, this BHC document prescribes a sewer line alignment, consisting of gravity/forced main lines, lift stations[,] and related equipment, extending sewer service from this site/vicinity south to the "Cross-Valley" sewer trunk line in the vicinity of Shaw Road-12th Avenue SE. Prior to issuance of any occupancy permits for this project site, said sanitary sewer infrastructure shall be installed, to City Engineer approval, the provision of which will adequately mitigate this potentially significant impact to Public Services/Utilities. **Please see Mitigation condition #8 later in this document for further detail.**

Clerk's Papers at 587. Mitigation condition #8 provided that "sanitary sewer infrastructure shall be installed, as specified in the 'Analysis for East Valley Sewer Service Area' technical memorandum (BHC Consultants, 11/7/14) or as otherwise approved by the City Engineer, to provide adequate sewer service" to the project site. *Id.* at 591.

sewer facilities that would benefit both of their properties. Under the agreement, Viking constructed a sewer lift station and sewer lines at Viking's "sole cost and expense," aside from a payment of $600,000 from Franklin. Clerk's Papers (CP) at 84. The lift station was constructed on Franklin's property, and the sewer lines were primarily constructed on property owned by Cascade Shaw Development, LLC (Cascade). Viking agreed not to seek latecomer fees from either Franklin or Cascade in exchange for the property rights granted and the monetary contribution from Franklin.

Franklin also came to an agreement with the city in which the city agreed to give Franklin a credit of approximately $253,000 in system development charges (SDCs), which are imposed on new customers who connect to the public sewer system. In the evidence submitted below, which includes both letters and emails sent to and from the city, the city offered inconsistent explanations about why it granted this credit.[2] Viking was not informed of this arrangement until it learned about the credits in a separate, related administrative appeal.

_____

[2] The record contains a letter from Franklin to the city in January 2015 indicating Franklin's intent to enter into a latecomer reimbursement contract because Franklin expected to fund construction of the facilities, though the letter also indicates that Franklin was coordinating with other developers in the area. Accordingly, the city may have agreed to credit the SDCs to Franklin in consideration of Franklin's plan to construct the sewer facilities that were ultimately constructed by Viking, without the city knowing that Viking actually constructed the facilities. However, the record is unclear on exactly when the city agreed to credit the fees for Franklin because it lacks any formal memorialization of the agreement. It was not until March 2019 that Franklin informed the city engineer in an email that, in an "earlier meeting[ ]," it had been agreed that Franklin's $600,000 payment to Viking would "offset" the SDCs, and the city engineer emailed back that the city agreed the SDCs were offset by Franklin's "[c]ontribution toward the lift station." *Id.* at 192. Therefore, in correspondence after the 2015 letter, it appears that the city knew that Viking would be the developer responsible for constructing the sewer facilities, and the city, without involving Viking, unilaterally decided that the credit it gave to Franklin would be deemed a contribution to Viking for the cost of constructing the sewer facilities. As a result, the city excused itself from the obligation to pay a latecomer fee when it later connected to the facilities as part of the city's development of a park on city-owned property.

### III. LATECOMER CONTRACT SOUGHT BY VIKING

Viking requested a latecomer contract from the City of Puyallup for partial reimbursement of its construction costs for the sewer facilities pursuant to RCW 35.91.020. The total cost for constructing the facilities was approximately $3.2 million. After accounting for the $600,000 contribution from Franklin, the "[t]otal cost reimbursable to Viking" was approximately $2.6 million. *Id.* at 31.

The city prepared a latecomer contract that stated both Franklin and the city contributed to the construction costs. Based on the square footage of property capable of being served by the sewer facilities, and excluding the square footage of the property owned by Franklin and the City of Puyallup, the reimbursement cost under the latecomer contract was $0.2728 per square foot. Under the contract prepared by the city, the city's property was excluded from the assessment roll, or list of properties obligated to pay latecomer fees to Viking. *See* PMC 14.20.040(1). The city otherwise would have been obligated to pay approximately $199,000 for connecting to the sewer lift station.

The Puyallup City Council held a public hearing on the latecomer contract. Viking's lawyer and one of its managers spoke at the hearing, opposing the exclusion of the city from paying latecomer fees. Following the hearing, the city council approved the contract in its current form (with the exception of an amendment to remove Cascade from any obligation to pay, pursuant to Viking's agreement with Franklin). Viking informed the city that it intended to sign the contract under protest after filing a lawsuit, and the city subsequently withdrew the DocuSign invitation for Viking to sign the contract, meaning no contract had been signed prior to the present litigation.

IV. LITIGATION

Viking brought a complaint for a declaratory judgment, injunctive relief, and writ of mandamus specifically challenging the city's decision to exclude its property from a pro rata payment obligation under the latecomer contract. According to Viking's complaint, because the relief it sought simply added a party—the city—to pay reimbursement fees, relief granted to Viking would not increase the payment obligation of any other property owners that were currently on the assessment roll. Viking's complaint also included a LUPA petition in the alternative "in an abundance of caution" so that it could preserve its right to challenge the latecomer contract, even though it did not believe that LUPA applied. *Id.* at 3. Viking also sought an order authorizing recording of the latecomer contract in the form approved by the city council so that Viking did not lose the opportunity to collect latecomer fees during the pendency of the litigation.

Puyallup brought a motion to dismiss and/or for summary judgment. Relevant here, Puyallup primarily argued that a developer who receives a contribution from any other party toward construction costs of sewer facilities, such as Viking, is not entitled to a latecomer contract under RCW 35.91.020(1)(a)[3] because sewer facilities are not installed solely at the developer's expense when there has been a contribution. Thus, Viking was not entitled to collect latecomer fees from any party who later connected to the sewer system it paid $2.6 million to construct

---

[3] As explained above, RCW 35.91.020(1)(a) provides:

> At the owner's request, a municipality must contract with the owner of real estate for the construction or improvement of water or sewer facilities that the owner elects to install solely at the owner's expense. The owner must submit a request for a contract to the municipality prior to approval of the water or sewer facility by the municipality. The owner's request may only require a contract under this subsection (1)(a) in locations where a municipality's ordinances require the facilities to be improved or constructed as a prerequisite to further property development.

because Franklin contributed $600,000 to the construction, and Franklin and Cascade both contributed property rights. Alternatively, the city argued that its $253,000 SDC credit to Franklin passed through to Viking and therefore constituted a contribution to the original cost of the facilities. Thus, the city argued, even if Viking was entitled to a latecomer contract under RCW 35.91.020(1)(a), Viking would not be able to seek latecomer fees from the city under RCW 35.91.020(2)(c) due to this contribution.

Puyallup also argued that the city council's approval of the latecomer contract was a land use decision and, therefore, subject to exclusive review under LUPA. Accordingly, because Viking did not serve its petition on " '[e]ach person identified by name and address in the local jurisdiction's written decision as an owner of the property at issue,' " which the city contended was all property owners required to pay latecomer fees under the contract, the city argued that the petition must be dismissed. CP at 47 (quoting RCW 36.70C.040).

The trial court denied the city's motion, and it also granted Viking's motion to record the latecomer contract. The contract was to be recorded with a notation indicating that Viking approved the contract except as to the issue of the city's payment obligation, which the parties were litigating, and that resolution of the dispute would not result in an increase in fees to any property owner on the assessment roll. Any fees collected pursuant to the latecomer contract would be paid into the court registry until the case was resolved.

Viking subsequently moved for summary judgment. Puyallup's responsive materials included a request to return the latecomer contract to the city council for correction. This was based on a declaration from City Engineer Hans Hunger, who stated: "Upon review of the documents related to this matter in preparation for providing this declaration I learned that several of the

numbers included in . . . [the] original latecomer agreement were incorrect." *Id.* at 554. Hunger attached "a new version . . . with the corrected numbers shown." *Id.* The declaration did not appear to provide any explanation regarding the correction or calculation of the numbers. The suggested changes in the new version included an increase in the total square footage of property able to be served by the sewer facilities and obligated to reimburse costs, as well as an increase in the total square footage of the City of Puyallup and Franklin properties "contributing to [the] project." *Id.* at 593. These changes resulted in a decrease to the reimbursement costs per square foot.

In support of Viking's reply, Viking submitted a declaration from a managing officer, who stated that the warehouse was approximately 450,000 square feet and that the "project could not have been constructed without connection to sewer. Septic was never a viable option." *Id.* at 612. There is no evidence in the record that disputes or conflicts with these assertions by Viking. The declaration also disputed Hunger's "corrected" numbers regarding the square footage able to be served by the sewer facilities, stating that it appeared that Hunger added undevelopable property to the calculations that the city had previously agreed could not be served by the lift station.

The trial court granted Viking's motion for summary judgment. The court specified that the motion was decided pursuant to the court's authority under the Uniform Declaratory Judgments Act, chapter 7.24 RCW, and that Viking's challenge as presented was not subject to exclusive review under LUPA. In addition, the court concluded that Puyallup was required to contract with Viking under RCW 35.91.020, the city's SDC credits to Franklin did not constitute a contribution to the original costs of constructing the sewer facilities, and, therefore, the city unlawfully excluded itself from the contract as a property owner obligated to pay a pro rata reimbursement to Viking upon connection to the facilities. Accordingly, the court ordered the city to revise the latecomer

contract to include the city as a property owner subject to latecomer fees. The court further ordered the city not to revise any aspect of the latecomer contract aside from this addition and accompanying reduction of other property owners' pro rata share of the reimbursement costs.

The city appeals the trial court's orders denying its motion for summary judgment and granting Viking's motion for summary judgment.

## DISCUSSION

### I. STANDARD OF REVIEW

We review a summary judgment order de novo, viewing the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Meyers v. Ferndale Sch. Dist.*, 197 Wn.2d 281, 287, 481 P.3d 1084 (2021). Summary judgment is appropriate when the pleadings, affidavits, depositions, and admissions on file demonstrate that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). "An issue of material fact is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Reyes v. Yakima Health Dist.*, 191 Wn.2d 79, 86, 419 P.3d 819 (2018). Here, the parties do not dispute any issue of material fact; rather, the questions presented in this appeal concern whether Viking was entitled to judgment as a matter of law.

### II. PRINCIPLES OF STATUTORY INTERPRETATION

Statutory interpretation is a question of law that we review de novo. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). Our "objective is to ascertain and carry out the Legislature's intent." *Id.* "[I]f the statute's meaning is plain on its face," we "must give effect to that plain meaning as an expression of legislative intent." *Id.* at 9-10. We are to discern plain meaning " 'from the ordinary meaning of the language at issue, the context of the

statute in which that provision is found, related provisions, and the statutory scheme as a whole.' "
*State v. Gonzalez*, 168 Wn.2d 256, 263, 226 P.3d 131 (2010) (quoting *State v. Engel*, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009)).

If, after a review of the plain meaning, a statute is susceptible to more than one reasonable interpretation, it is ambiguous. *Id.* "[B]ut 'a statute is not ambiguous merely because different interpretations are conceivable.' " *Id.* (internal quotation marks omitted) (quoting *Est. of Haselwood v. Bremerton Ice Arena, Inc.*, 166 Wn.2d 489, 498, 210 P.3d 308 (2009)). If a statute is ambiguous, we may look to legislative history and relevant case law to discern legislative intent. *Jametsky v. Olsen*, 179 Wn.2d 756, 762, 317 P.3d 1003 (2014).

## III. APPLICABILITY OF LUPA

The city argues that LUPA is the exclusive means of challenging the city council's approval of the latecomer contract and that the trial court erred by not dismissing Viking's lawsuit because Viking failed to comply with LUPA's procedural requirements. Viking argues that LUPA does not apply because the city's property is not regulated by the latecomer contract and, even if LUPA did apply, Viking complied with LUPA's procedural requirements. We agree with Viking.

### A. LEGAL PRINCIPLES

With limited exceptions, LUPA is "the exclusive means of judicial review of land use decisions." RCW 36.70C.030(1). However, if an appeal does not involve a "land use decision," it is not subject to review under LUPA. *Cave*, 199 Wn. App. at 656. LUPA defines land use decision as follows:

> [A] final determination by a local jurisdiction's body or officer with the highest
> level of authority to make the determination, including those with authority to hear
> appeals, on

11

(a) An application for a project permit or other governmental approval required by law before real property may be improved, developed, modified, sold, transferred, or used . . . ;

(b) An interpretative or declaratory decision regarding the application to a specific property of zoning or other ordinances or rules regulating the improvement, development, modification, maintenance, or use of real property; and

(c) The enforcement by a local jurisdiction of ordinances regulating the improvement, development, modification, maintenance, or use of real property. . . .

RCW 36.70C.020(2)(a)-(c).

B. ANALYSIS

Puyallup argues that LUPA is the exclusive means of challenging the city council's decision to approve the latecomer contract at issue in this case because that constituted a land use decision.

The parties dispute whether *Cave* is controlling on the issue of whether the latecomer contract in this case is subject to exclusive review under LUPA. In *Cave*, this court held that the Bainbridge Island City Council's approval of a latecomer reimbursement contract was a land use decision under RCW 36.70C.020(2)(b). 199 Wn. App. at 654. In the contract at issue in *Cave*, property owners in the identified area were required to pay reimbursement charges prior to connecting to the water main that had been installed by another property owner. *Id.* The only undeveloped properties in the reimbursement area were owned by Cave and the developing owner who requested the latecomer contract. *Id.*

Relying on principles of statutory interpretation, the *Cave* court concluded that the city council's approval of the contract met the three elements to qualify as a land use decision under RCW 36.70C.020(2)(b): "(1) an interpretative or declaratory decision[,] (2) regarding the application to a specific property[,] (3) of zoning or other ordinances or rules regulating the

improvement, development, modification, maintenance, or use of real property." *Id.* at 663. Regarding the final element, the court reasoned that the latecomer reimbursement contract was governed by the city's ordinances and that "the ordinances 'regulated' Cave's use and development of its property" because Cave was required to pay the charges prior to any development on its property that would necessitate connection to the water main covered by the contract. *Id.* at 664.[4]

Here, Viking's specific challenge concerned Puyallup's decision to exclude itself from any payment obligation under the latecomer contract. *Cave*, therefore, does not resolve the issue of whether the city council's decision to approve the contract was a land use decision because the city was not required to pay any fees prior to development on its property requiring connection to the facilities, as was the situation in *Cave*. As noted by the court in *Cave*, the latecomer contract was governed by the city's ordinances, and the reason these ordinances regulated Cave's property use and development was because the fees needed to be paid prior to any development on the property. *Id.* But here, as pointed out by Viking, the city's property was specifically excluded from the assessment roll and was not subject to the latecomer contract. Accordingly, Puyallup's specific property was not regulated by the decision, so Viking's challenge was not subject to exclusive review under LUPA.

---

[4] The court noted that an unpublished Division One case was instructive but "not directly on point" because the contract in the other case mandated reimbursement payments if property owners engaged in any development, whereas the contract at issue in *Cave* only mandated reimbursement payments if a property owner intended to connect to the water main. 199 Wn. App. at 665-66.

C. WHETHER VIKING COMPLIED WITH LUPA'S PROCEDURAL REQUIREMENTS

Even if LUPA applied in this case, Viking complied with LUPA's procedural requirements.

LUPA's procedural requirements are strictly enforced, and a party's failure to comply with these requirements bars their LUPA petition. *Viking JV, LLC v. City of Puyallup*, 22 Wn. App. 2d 1, 9, 509 P.3d 334 (2022). Relevant here, a LUPA petition must be dismissed unless it is timely filed with the court and served on "[e]ach person identified by name and address in the local jurisdiction's written decision as an owner of the property at issue." RCW 36.70C.040(2)(b)(ii).

Puyallup argues that Viking's LUPA petition should have been dismissed because Viking failed to serve the petition on "the owners of the properties at issue that the latecomer application and decision included as regulated properties." Br. of Appellant at 33. In other words, Puyallup contends that all property owners required to pay reimbursement fees under the latecomer contract were owners of "the propert[y] at issue" and that Viking was required to serve its petition on these property owners. *Id.*

However, Viking's challenge to the latecomer contract concerned *only* the city's decision to exclude itself from any payment obligation under the contract. Viking's complaint even clarified that, because the relief it sought added a party to pay reimbursement fees, it would not increase the payment obligation of any other property owners already identified in the contract. If, to qualify as a land use decision under RCW 36.70C.020(2)(b), the decision must concern a "specific property," then that must in turn be the "property at issue" for purposes of serving the proper parties with the petition under RCW 36.70C.040(2)(b)(ii). Accordingly, here, the "specific

property" in the land use decision is the city's property, which Viking is challenging the exclusion of in the contract.

Puyallup does not challenge the service of Viking's petition on Puyallup, only on other property owners, which Viking was not required to do. Viking complied with LUPA's procedural requirements, so it was not error for the trial court not to dismiss the petition on this basis.

## IV. WHETHER VIKING IS ENTITLED TO A LATECOMER CONTRACT UNDER RCW 35.91.020 AND WHETHER PUYALLUP CONTRIBUTED TO THE ORIGINAL COST OF THE FACILITIES

Puyallup argues that Viking is not entitled to a latecomer contract under RCW 35.91.020 because Viking did not meet the requirements under that statute, and that, even if Viking is entitled to a latecomer contract under the statute, the city should not be required to pay latecomer fees to Viking under the contract because it contributed to the original cost of the facilities. Viking argues that it met the requirements under RCW 35.91.020 to be entitled to a latecomer contract under the statute and that the city did not contribute to Viking's original construction costs. We agree with Viking.

### A. LEGAL PRINCIPLES

As explained above, "a municipality must contract with the owner of real estate for the construction or improvement of water or sewer facilities that the owner elects to install solely at the owner's expense." RCW 35.91.020(1)(a). Such a contract is to provide for reimbursement for the cost of construction on a pro rata basis when other property owners subsequently connect to or use the facilities. RCW 35.91.020(2)(b)-(c).

But a contract is only required by statute when the "municipality's ordinances require the facilities to be improved or constructed as a prerequisite to further property development." RCW

15

35.91.020(1)(a). Furthermore, the latecomer fees under the contract must only come from property owners "who did not contribute to the original cost of the facilities." RCW 35.91.020(2)(c).

B. ANALYSIS

*1. Whether Viking is Entitled to a Latecomer Contract*

*a. Contributions Do Not Defeat a Property Owner's Ability to Seek a Latecomer Contract*

The city argues that Viking is not entitled to a latecomer contract under RCW 35.91.020 because the facilities were not installed solely at Viking's expense due to Franklin's monetary contribution to the construction cost.

Puyallup's argument that Viking is not entitled to a latecomer contract under the statute because the facilities were not constructed solely at Viking's expense is without merit. When determining the plain meaning of a statute, we look at related statutory provisions. *Gonzalez*, 168 Wn.2d at 263. As noted by Viking, the requirement in RCW 35.91.020 that the developing owner must install the sewer facilities "solely at the owner's expense" appears in subsection (1)(a), and further in the statute, it clarifies that latecomer fees may only be collected "from property owners who subsequently connect to or use the . . . sewer facilities, *but who did not contribute to the original cost of the facilities*." RCW 35.91.020(2)(c) (emphasis added).

The fact that property owners "who did not contribute to the original cost of the facilities" are subject to paying fees under a latecomer contract shows that the legislature contemplated circumstances where other property owners may choose to contribute and, due to their contribution, should not be required to pay fees under such a contract. *Id.* Such a contribution clearly does not preclude a developing owner from seeking latecomer reimbursement from other property owners for portions that the developing owner solely paid for; the owner is simply only

16

able to seek reimbursement for those costs that were solely their expense. RCW 35.91.020(1)(a). Puyallup responds that subsection (2)(c) "simply confirms that latecomer fees will not be collected from the property owner who installed the facilities," but this argument is illogical considering the reimbursements go to *that* property owner. Reply Br. of Appellant at 28. Accordingly, Viking satisfied the requirement that the facility costs subject to reimbursement were solely Viking's because Franklin's $600,000 contribution was excluded from the costs for which it sought reimbursement.

### b. Viking Was Required to Install the Sewer Facilities

The city also argues that Viking is not entitled to a latecomer contract because Puyallup's ordinances did not require Viking to construct the facilities as a prerequisite to further development. We disagree.

Puyallup's argument can be summarized as follows: In planning this project, Viking had two different options. The first option was for Viking to install its own septic system that would not have required installation of sewer infrastructure. The city contends that Viking did not utilize this option, even though it could have, because it "chose instead to maximize warehouse square footage." Br. of Appellant at 7.

The second option was for Viking to install sewer infrastructure consisting of a sewer lift station and sewer lines to extend city sewer service. Under this option, the city concedes that it did require these facilities to be installed in order for Viking to satisfy the MDNS that was issued for this project. According to the city, however, the requirements under the MDNS only became true requirements on which further development was conditioned because Viking *chose* this second option rather than simply install a septic system.

17

Puyallup's argument, however, ignores that a septic system was not viable for the 450,000-square foot warehouse Viking sought to build. To say that Viking could have chosen the first option of installing its own septic system is tantamount to saying that Viking could have chosen not to build the warehouse at all. Puyallup has never disputed Viking's declaration that it could not have installed a septic system for this warehouse.

Puyallup relies on this court's decision in *Woodcreek Land Ltd. Partnerships I, II, III and IV v. City of Puyallup*, 69 Wn. App. 1, 847 P.2d 501 (1993). In *Woodcreek*, the city made street improvements after a traffic study recommended widening the street. 69 Wn. App. at 2-3. After the first improvement phase was complete, the city sought reimbursement through latecomer fees from property owners in the affected area. *Id.* at 3. Following a challenge from one of the property owners, the court analyzed language from RCW 35.72.010 stating that a municipality " 'may contract with owners of real estate for the construction or improvement of street projects which the owners elect to install as a result of ordinances that require the projects as a prerequisite to further property development.' " *Id.* at 4-5 (quoting RCW 35.72.010).

The city in *Woodcreek* urged this court to hold that Title 21 of the PMC, which "set up the City's environmental policy and which adopted the City's Comprehensive Plan," and also expressed an intent to improve that specific street, satisfied the ordinance requirement. *Id.* at 6. However, the court explained that those provisions did not require such improvements prior to further property development and did not satisfy the requirements of RCW 35.72.010. *Id.*

Title 21 PMC, Puyallup's environmental policy, was adopted by ordinance under SEPA[5] and accompanying regulations. PMC 21.04.010. Under this portion of the PMC, mitigation

---

[5] State Environmental Policy Act (SEPA), ch. 43.21C RCW.

measures found in an MDNS issued by the city "shall be deemed conditions of approval of the permit decision and may be enforced in the same manner as any term or condition of the permit, or enforced in any manner specifically prescribed by the city." PMC 21.04.120(7).

Here, Puyallup argues that "[c]onsistent with *Woodcreek*, [ ] there is no City ordinance that required Viking to improve or construct the facilities as a prerequisite to further property development." Br. of Appellant at 45. However, in *Woodcreek*, the improvements were not made as a mitigation measure required by an MDNS. Although no provision of Title 21 PMC specifically requires construction of the sewer facilities in this case, Puyallup acted under its authority within Title 21 to require Viking to construct sewer facilities consistent with a technical memorandum that prescribed the type of sewer infrastructure necessary for the project before Viking could obtain any occupancy permits for the project site. The MDNS stated that this was required because "[t]here is no existing City sewer infrastructure serving the project site and surrounding area, thus constituting a potentially significant impact given potential future sewer needs of the site and vicinity under current zoning." CP at 587 (emphasis omitted).

Because Puyallup acted under its SEPA authority consistent with Title 21 PMC in requiring Viking to construct the sewer facilities as a condition of development, we hold that the ordinances required Viking to construct the facilities as a prerequisite to further development. Accordingly, Viking satisfied the requirements of RCW 35.91.020 and Puyallup was therefore required to enter into a latecomer contract with Viking under the statute.

*2. Whether Puyallup Contributed to Original Cost of the Facilities*

Puyallup further argues that, even if Viking is entitled to a latecomer contract under RCW 35.91.020, the city should not be required to pay latecomer fees under any such contract because

19

it contributed to the original cost of the facilities. Specifically, Puyallup argues that its SDC credits to Franklin passed through to Viking as a contribution.

The statute does not define contribution, but it states that reimbursements through latecomer fees may only be collected from "property owners who subsequently connect to or use the . . . sewer facilities, but who *did not contribute to the original cost of the facilities*." RCW 35.91.020(2)(c) (emphasis added). In its argument, Puyallup points out that the city's $253,000 in credits went to Franklin to offset Franklin's contribution to the lift station. Therefore, under the city's own argument, it plainly did not "contribute to the original cost of the facilities." *Id.* Rather, *Franklin* contributed $600,000 to the original cost of the facilities, and the city credited SDCs to Franklin that it otherwise would have charged for Franklin's connection to the facilities under the assumption that this credit would be a contribution. But this credit did not go toward the original cost of the facilities; it might be more accurate to say that the credit partially reimbursed Franklin for the money that Franklin contributed to the original cost of the facilities.

Furthermore, Franklin's contribution was not included in the costs for which Viking seeks reimbursement. As described above, under RCW 35.91.020(1)(a), a developing owner may only seek reimbursement for construction of sewer facilities that were solely at the owner's expense. Any pro rata reimbursement to the owner under a latecomer contract, therefore, actually reimburses the developing owner for the costs it actually incurred, with contributing property owners specifically excluded, so that the developing owner is not reimbursed for costs paid by contributors. Because Franklin's $600,000 contribution was, therefore, excluded from Viking's costs under the latecomer agreement, it is unclear how the city's credit to Franklin as a result of this contribution would be a contribution for the costs for which Viking sought reimbursement.

To the extent that Puyallup argues that it partially reimbursed Franklin for its contribution to Viking, rendering the $600,000 received by Viking a *joint contribution* from both Franklin and the city, it would be unfair to reduce the reimbursement Viking should receive through a latecomer contract based on a side agreement that it was never informed of. Viking contracted for the $600,000 contribution from Franklin in exchange for Viking incurring the remainder of the construction costs, and Viking agreed by contract not to pursue latecomer fees from Franklin and Cascade due to this contribution. Viking made no such agreement with the City of Puyallup.

We hold that Puyallup's SDC credits to Franklin did not constitute a contribution to the original cost of the sewer facilities.

## V. REVISIONS TO LATECOMER CONTRACT

Lastly, the city contends that the trial court erred by refusing to allow the city to make corrections to the latecomer contract before signing it. The city's argument is based on the declaration of the city engineer, Hunger, who stated that he "learned that several of the numbers included in . . . [the] original latecomer agreement were incorrect" after he reviewed the documents to prepare his declaration. CP at 554. However, the city claims that we "need not sort through the various calculations and exhibits to the latecomer agreement," confining its argument to the idea that if the latecomer contract is not a land use decision under LUPA, the city should be able to make whatever corrections it deems necessary to the calculations. Reply Br. of Appellant at 35.

The city has not made any argument to this court that any corrections are actually necessary; it merely states that if it believes corrections are necessary, it should be allowed to make such corrections. But the city has cited no authority for such a proposition. When a party cites no authority in support of a proposition, we may assume counsel has found none. *DeHeer v. Seattle*

21

No. 56803-9-II

*Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962). Accordingly, the city has not established any error in the trial court's decision not to allow corrections to the latecomer contract.

CONCLUSION

We hold that Puyallup's arguments are without merit and affirm the trial court's orders denying summary judgment to Puyallup and granting summary judgment to Viking.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
CRUSER, J.

We concur:

_____
GLASGOW, J.

_____
CHE, J.

22