# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MICHAEL AALAND, on his own behalf and on behalf of other similarly situated persons,<br><br>                    Appellant,<br><br>          v.<br><br>CRST Home Solutions, LLC, a New Jersey Limited Liability Company, and John/Jane Doe, an individual,<br><br>                    Respondent. | No. 86708-3-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

COBURN, J. — Michael Aaland received an unsolicited text message from CRST Home Solutions, LLC (CRST)[1] seeking to recruit him to join a network of independent contractors who provide delivery and installation services for CRST's retail and manufacturing company clients. CRST sent similar text messages to various Washington cell phone consumers as part of a larger recruitment effort to add independent contractors to its delivery and installation service network. Aaland brought a class action against CRST alleging that this unsolicited text message campaign violated the Commercial Electronic Mail Act (CEMA), chapter 19.190 RCW.

The sole issue on review is whether the trial court erred by deciding as a matter

---

[1] Respondent CRST Home Solutions, LLC is a division of CRST, which maintains different lines of business. We generally refer to respondent as "CRST" for simplicity.

of law that the text messages sent by CRST do not meet the definition of "commercial" to be prohibited by CEMA. Because we hold that these text messages fall within the meaning of "commercial" under the plain language of RCW 19.190.010(3), we reverse the court's granting of summary judgment to CRST and remand for entry of summary judgment in favor of Aaland and the class and for further proceedings consistent with this opinion.

FACTS

CRST provides transportation and logistic services by facilitating the delivery and installation of consumer electronics and appliances for retail and manufacturing companies. Company clients include, for example, Lowe's, Home Depot, and Best Buy. CRST sells delivery and installation services to the companies, who generally pay CRST per delivery and/or installation. CRST manages a network of independent contractors, including electricians and other skilled tradespeople, to complete the deliveries and installations in Washington.

Deidre Kelley testified that as a field recruiter for CRST, she "contact[ed] potential independent contractors … to potentially come on and complete delivery and installation work that CRST has with retail clients." She explained that CRST has "contracts with retail companies to provide independent contractors who can do the delivery and installations for them. So to fulfill our contracts with the retailers, we need to have independent contractors who are interested in doing network, which means we need to find them." Kelly testified that she cold calls, emails, or texts potential independent contractors.

CRST representative Noah Kroll-Haeick testified that CRST's revenue depends on its ability to maintain contractual relationships with independent contractors to perform delivery and installation services that CRST sells to retail and manufacturing company customers. When asked, "What are some … ways that CRST seeks to be more profitable than its competition?" Kroll-Haeick answered:

> By offering a superior product. And by that I mean successful management of the quality of the work our contractors perform. And what that boils down to is recruitment of the best contractors in the business as well as building strong, long-lasting relationships with those contractors.

CRST identifies potential independent contractors to contact by searching for publicly available information on the internet. For example, recruiters "start[] with a Google search 'Appliance installers in Seattle.'" Recruiters would try to determine through their initial cold contacts with potential independent contractors whether they were interested or not in partnering with CRST. If interested, the recruiter conducts a vetting call with the potential contractor to confirm that they are "a strong fit for a partnership" with CRST, including "figur[ing] out whether the company is incorporated, whether they have insurance that meets our insurance requirements, that they're willing to submit drug screens, and … background checks for all of their technicians that they intend to send into customers' homes." Kroll-Haeick stated this screening process is CRST's method of recruiting the best contractors in the business. CRST negotiates rates with each of its contractors and charges retailer and manufacturer customers a higher rate than it pays its contractors.

CRST measures recruiter performance by tracking the number of independent contractors that recruiters successfully onboard or "activate," which is when an independent contractor installer "has partnered with [CRST] and is able to begin

receiving installation work from [CRST]." CRST incentivizes recruiters with gift cards based on how many contractors they activate in a month. On the other hand, CRST considers any recruiter's failure to meet monthly expectations for activated contractors as poor performance and provides training as it deems appropriate. A recruiter's continued failure to meet monthly activation goals may lead to the recruiter's termination.

Additionally, CRST advertises the size of its independent contractor network. CRST's website states that it has "300+ delivery partners," "3,500+ installation technicians," "[s]ervices all U.S.," and "[c]entralized dispatch and call centers." CRST markets itself as specializing in arranging deliveries and having a "[n]etwork of over 300 qualified independent carrier partners across 100+ separate locations throughout the U.S. and Canada," which "creates a unique value proposition for customers seeking nationwide coverage."

As part of its independent contractor recruitment program, CRST sent unsolicited text messages to various individuals throughout Washington. While working as a licensed general contractor in April 2022, Aaland received one of these messages from Kelley, which stated:

> Hi,
> I'm looking for a licensed plumber that may be interested in doing residential dishwasher installations for retailers like Lowe's and Best Buy in the Seattle area.
>
> If you'd like more information, please respond with your email address (note: does not add you to any lists) or give me a call at this number.
> Thank you!
> -Deidre, recruiter for CRST

Kroll-Haeick testified that CRST sent Aaland the text "[t]o see if he was interested in doing business with us." Kelly testified that all the text messages she sent to potential contractors in Washington "were for purposes of recruitment."

Aaland subsequently filed a class action against CRST Home Solutions, LLC in August alleging that CRST sent commercial electronic text messages to Aaland and class members' cell phones in violation of RCW 19.190.060 of CEMA that constituted per se violations of the Consumer Protection Act (CPA), chapter 19.86 RCW.

In July 2023 Aaland filed an unopposed motion for class certification, which the trial court granted. The parties filed competing summary judgment motions in January 2024. At that time, the parties agreed that the sole dispositive issue was the legal question of whether the text messages that CRST sent to Aaland and class members "promote[d] real property, goods, or services for sale or lease" to qualify as "commercial" under CEMA. See RCW 19.190.010(3). Each party filed respective oppositions and replies. The trial court granted CRST's summary judgment motion, denied Aaland's motion for summary judgment, and entered a final judgment dismissing Aaland's class action with prejudice. Aaland appeals.[2]

DISCUSSION

Standard of Review

We review summary judgment orders de novo and engage in the same inquiry as the trial court. Neighbors v. King County, 15 Wn. App. 2d 71, 80, 479 P.3d 724 (2020); Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 164, 273 P.3d 965 (2012). "We

---

[2] Referenced below, the state attorney general submitted an amicus curiae brief for consideration in this matter. In addition to its response brief, CRST filed its own answer to the attorney general's brief.

consider all facts and reasonable inferences in the light most favorable to the nonmoving party." Litvack v. Univ. of Wash., 30 Wn. App. 2d 825, 842, 546 P.3d 1068 (2024). Summary judgment is properly granted where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits do not present genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Neighbors, 15 Wn. App. 2d at 80; CR 56(c). A material fact is a fact upon which the outcome of the litigation depends in whole or in part. Hisle v. Todd Pac. Shipyards Corp., 151 Wn.2d 853, 861, 93 P.3d 108 (2004). The purpose of summary judgment proceedings is to avoid a useless trial. Lamon v. McDonnell Douglas Corp., 91 Wn.2d 345, 349, 588 P.2d 1346 (1979). Where the material facts are undisputed and no element of discretion is involved, this court must determine whether applicable legal principles support the trial court's ruling. Hatley v. City of Union Gap, 106 Wn. App. 302, 307, 24 P.3d 444 (2001) (citing Hiatt v. Walker Chevrolet Co., 120 Wn.2d 57, 66, 837 P.2d 618 (1992)).

In the present case, the parties agree that the sole dispositive issue before the trial court was whether the texts messages sent by CRST to Aaland and the class qualify as "commercial" as defined under CEMA by RCW 19.190.010(3). The scope and application of RCW 19.190.010(3) is an issue of statutory interpretation, which is a question of law we review de novo. Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wn.2d 1, 9, 43 P.3d 4 (2002). Statutory interpretation begins with the statute's plain meaning. Lake v. Woodcreek Homeowners Ass'n, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). A court's fundamental objective when interpreting statutes "is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then

the court must give effect to that plain meaning as an expression of legislative intent." Campbell & Gwinn, 146 Wn.2d at 9-10. We discern plain meaning "'from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.'" Lake, 169 Wn.2d at 526 (quoting State v. Engel, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009)). "A statute that is clear on its face is not subject to judicial construction." State v. J.M., 144 Wn.2d 472, 480, 28 P.3d 720 (2001). Thus, where a statute's language is unambiguous based on a plain language reading, a court's inquiry ends. State v. Gray, 174 Wn.2d 920, 927, 280 P.3d 1110 (2012).

While a court may look for guidance in the statutory context, it "must not add words where the legislature has chosen not to include them." Rest. Dev., Inc. v. Cananwill, Inc., 150 Wn.2d 674, 682, 80 P.3d 598 (2003). "Omissions are deemed to be exclusions." Wright v. Lyft, Inc., 189 Wn.2d 718, 727, 406 P.3d 1149 (2017). "'Statutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous.'" Davis v. State ex rel. Dep't of Licensing, 137 Wn.2d 957, 963, 977 P.2d 554 (1999) (quoting Whatcom County v. City of Bellingham, 128 Wn.2d 537, 546, 909 P.2d 1303 (1996)). Importantly, as a consumer protection statute, we must also construe CEMA liberally in favor of the consumers it aims to protect. Brown v. Old Navy, LLC, No. 102592-1, slip op. at 7 (Wash. Apr. 17, 2025), https://www.courts.wa.gov/opinions/pdf/1025921.pdf; Jametsky v. Olsen, 179 Wn.2d 756, 765, 317 P.3d 1003 (2014).

Lastly, we consider a statute ambiguous where it is subject to more than one reasonable interpretation. Jametsky, 179 Wn.2d at 762. However, the mere fact that

7

different interpretations are conceivable is not sufficient to render a statute ambiguous. Gray, 174 Wn.2d at 927. Ambiguity must stem from the statute's language and not from external considerations that arise separate from the statute itself. Cerrillo v. Esparza, 158 Wn.2d 194, 203-04, 142 P.3d 155 (2006). If a statute is ambiguous, then we engage in statutory construction and look to legislative history and circumstances surrounding its enactment to derive legislative intent. Lake, 169 Wn.2d at 527.

<u>CEMA</u>

Because RCW 19.190.010(3) must be read in the context of its larger statutory scheme, we first turn to the legislative development of CEMA to put .010(3) in context. See Campbell & Gwinn, 146 Wn.2d at 11; Wright, 189 Wn.2d at 724.

CEMA was enacted in 1998 during the Internet's dial-up era to address an increasing number of consumer complaints about unwanted commercial electronic mail (e-mail) messages described as "spam." Brown, slip op. at 2 (citing LAWS OF 1998, ch. 149, § 1); Wright, 189 Wn.2d at 724 (citing FINAL B. REP. ON SECOND ENGROSSED SUBSTITUTE H.B. 1888, 59th Leg., Reg. Sess. (Wash. 2005); LAWS OF 1998, ch. 149, § 4 (codified in RCW 19.190.030)). The legislature was particularly concerned about the rising volume of commercial e-mails and the costs absorbed by consumers by paying internet providers for the time required to sift through their in-boxes cluttered with commercial e-mail spam. Brown, slip op. at 2-3 (citing LAWS OF 1998, ch. 149, § 1; FINAL B. REP. ON ENGROSSED SUBSTITUTE H.B. 2752, at 1, 55th Leg., Reg. Sess. (Wash. 1998); S.B. REP. ON ENGROSSED SUBSTITUTE H.B. 2752, at 1, 55th Leg., Reg. Sess. (Wash. 1998)). Under the act, RCW 19.190.020 prohibits sending Washington residents "a

commercial electronic mail message"[3] that misrepresents the sender's identity or contains any false or misleading information in the subject line. Id. at 3-4, 20.

Since its original enactment, the legislature has amended CEMA three times to increase the range of prohibited electronic practices. Wright, 189 Wn.2d at 724 (citing LAWS OF 1999, ch. 289; LAWS OF 2003, ch. 137; LAWS OF 2005, ch. 378).

In 2003 the legislature amended CEMA to respond to the increase in unsolicited commercial text messages sent to cell phones. Id. (citing LAWS OF 2003, ch. 137, § 1). As a result, RCW 19.190.060(1) of CEMA precludes the initiation or facilitation of unsolicited commercial text messaging to Washington residents. LAWS OF 2003, ch. 137, § 3(1). The legislature recognized:

> [T]he number of unsolicited commercial text messages sent to cellular telephones and pagers is increasing. This practice is raising serious concerns on the part of cellular telephone and pager subscribers. These unsolicited messages often result in costs to the cellular telephone and pager subscribers in that they pay for use when a message is received through their devices. The limited memory of these devices can be exhausted by unwanted text messages resulting in the inability to receive necessary and expected messages. The legislature inten[ds] to limit the practice of sending unsolicited commercial text messages to cellular telephone or pager numbers in Washington.

LAWS OF 2003, ch. 137, § 1.

Specifically, RCW 19.190.060 provides that:

No person conducting business in the state may initiate or assist in the transmission of an electronic commercial text message to a telephone number assigned to a Washington resident for cellular telephone or pager service.

---

[3] A prohibited "commercial electronic mail message" under CEMA is "an electronic mail message sent for the purpose of promoting real property, goods, or services for sale or lease." RCW 19.190.010(2).

RCW 19.190.060(1).[4] Our state Supreme Court has observed that CEMA's unsolicited commercial text message prohibition "reflects lawmaker's intent to limit the practice of sending any unsolicited commercial text messages because they cause injury to consumers by using limited data and memory of mobile devices and interrupting receipt of necessary and expected messages." Wright, 189 Wn.2d at 731 (citing RCW 19.190.060).

Violations of CEMA's text message and e-mail prohibitions are per se violations of the CPA.[5] See id. at 728-32; Brown, slip op. at 4, 14; see RCW 19.190.030(1), .060, .040, .100.

Commercial Electronic Text Message

CEMA defines a "commercial electronic text message" as:

> an electronic text message[6] sent to promote real property, goods, or services for sale or lease.

RCW 19.190.010(3).

The parties do not cite any Washington appellate decisions, and we are aware of none, that have addressed the scope of RCW 19.190.010(3). As a matter of first

---

[4] CEMA is generally not violated where a "message is transmitted at the direction of a person offering cellular telephone or pager service to the person's existing subscriber at no cost to the subscriber" or where a person who has "clearly and affirmatively consented in advance to receive these text messages." RCW 19.190.070(1).

[5] The CPA prohibits unfair methods of competition and unfair or deceptive trade or commerce acts. RCW 19.86.020. Per se CPA violations are based on the legislature's acknowledgement that certain conduct is definitively against the public interest. Brown, slip op. at 14; see also Br. of Amicus Curiae Att'y Gen. of State of Wash. at 6 (citing Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc., 162 Wn.2d 59, 79, 170 P.3d 10 (2007)).

[6] The statute defines "electronic text message" as "a text message sent to a cellular telephone or pager equipped with short message service or any similar capability, whether the message is initiated as a short message service message or as an electronic mail message." RCW 19.190.010(6).

impression, Aaland asks this court to adopt a broad application of subsection (3) that does not require a text message to be an unsolicited attempt to sell property, goods, or services directly to the message recipient. Aaland argues that subsection (3) encompasses, in part, the promotion of services that are for sale to anyone. In applying subsection (3) to this record, he avers that the subject text messages promoted CRST's services sold to retail and manufacturer clients.

CRST concedes that subsection (3) does not require that the text messages "attempt to sell goods or services specifically to the message recipient." However, CRST argues that its text messages were not attempts to sell anything to anyone but instead were sent to recruit contractors to fulfill existing orders from its company clients. CRST claims that because it was neither charging contractors for its recruitment efforts nor attempting to facilitate a transaction by sending the text messages, the messages cannot be said to be promoting a service "for sale."

The attorney general,[7] as amicus curiae, urges this court to adopt Aaland's interpretation of subsection (3). Br. of Amicus Curiae Att'y Gen. of State of Wash. at 8 n.1.

To determine the scope of RCW 19.190.010(3), we first look to the plain language of the provision. See Lake, 169 Wn.2d at 526. Subsection (3) plainly provides two elements for a text message to be subject to CEMA regulation: (1) that the message is sent to "promote" some form of real property, good, or service and (2) that such real property, good, or service is for sale or lease.

---

[7] We note that the attorney general is charged with the administration of enforcement of Washington's consumer protection laws, including CEMA. Gold Seal Chinchillas, Inc. v. State, 69 Wn.2d 828, 833, 420 P.2d 698 (1966); Brown, slip op. at 4.

CEMA does not provide a definition for "promote." Accordingly, we give the word its ordinary meaning. State v. Valdiglesias LaValle, 2 Wn.3d 310, 319, 535 P.3d 856 (2023). We may employ extrinsic aids to interpret statutory language, including turning to standard dictionaries to ascertain plain and ordinary meaning. Id.; Garrison v. Wash. State Nursing Bd., 87 Wn.2d 195, 196, 550 P.2d 7 (1976).

The dictionary definition of "promote" encompasses three different categories of definitions that indicate that the meaning of the word depends on the context in which it is used. MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/promote (last visited August 26, 2025). Two of the categories are not particularly helpful in a commercial or business communication context.[8] See Valdiglesias LaValle, 2 Wn.3d at 319 (stating that to determine which view the legislature took in applying a certain definition, a court must read the word "in the context of the whole statute, 'not in isolation or subject to all possible meanings found in a dictionary'") (quoting State v. Lilyblad, 163 Wn.2d 1, 9, 177 P.3d 686 (2008)).

The third category is contextually appropriate to a commercial communication situation and defines "promote" as "a: to contribute to the growth or prosperity of: FURTHER … b: to help bring (something, such as an enterprise) into being: LAUNCH[, or] c: to present (merchandise) for buyer acceptance through advertising, publicity, or discounting." MERRIAM-WEBSTER ONLINE DICTIONARY, supra.

---

[8] That is, to positionally achieve an advancement or change in rank or grade. See MERRIAM-WEBSTER ONLINE DICTIONARY, supra ("a: to advance in station, rank, or honor: RAISE[,] b: to change (a pawn) into a piece in chess by moving to the eighth rank[,] c: to advance (a student) from one grade to the next higher grade"). Or the slang definition of "to get possession of by doubtful means or by ingenuity." Id.

Though these definitions cover a broad range of applications, there is nothing in the statute to suggest that the legislature intended to further limit the meaning of "promote." To do so would require this court to read additional words into the statute, which courts must not do. Rest. Dev., Inc., 150 Wn.2d at 682 ("[A] court must not add words where the legislature has chosen not to include them."). Broad language does not render a statute ambiguous or unclear. See Brown, slip op. at 16. Indeed, engaging in a plain language interpretation, our state Supreme Court recently refused to unilaterally add limiting language to CEMA's e-mail prohibition. Id. at 10-11 (discussing RCW 19.190.020(1)(b)).

The plain language of RCW 19.190.010(3) thus conflicts with CRST's assertion that a text message must be sent to facilitate a sale of real property, goods, or service to be prohibited under CEMA. To limit the definition of a commercial text message in this way disregards the broad meaning of "promote," which this court must assume the legislature used with particularity and intention. See State v. Delgado, 148 Wn.2d 723, 727, 63 P.3d 792 (2003) (stating that courts must "assume the legislature 'means exactly what it says'") (quoting Davis, 137 Wn.2d at 964). We must therefore give effect to the broad reach of "promote" in interpreting the scope of RCW 19.190.010(3). See Davis, 137 Wn.2d at 963 ("'Statutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous.'") (quoting Whatcom County, 128 Wn.2d at 546).

We agree with CRST to the extent that the facilitation of a sale is a conceivable application of "promote." See MERRIAM-WEBSTER ONLINE DICTIONARY, supra (including "c: to present (merchandise) for buyer acceptance through advertising, publicity, or

discounting"). However, the legislature's plain use of "promote" does not lose its broad meaning[9] and/or become ambiguous merely because an interpretation is conceivable. See Brown, slip op. at 8. Rather, if "persons of ordinary intelligence can understand what the [law] proscribes, notwithstanding some possible areas of disagreement, the [law] is sufficiently definite." City of Spokane v. Douglass, 115 Wn.2d 171, 179, 795 P.2d 693 (1990). We will otherwise not find ambiguity based on considerations that do not arise from the statutory language. Cerrillo, 158 Wn.2d at 203-04; Brown, slip op. at 16-17.

The plain language of subsection (3) only otherwise limits a text message sender's promotion of real property, goods, or services by specifying that such property, goods, or services must be "for sale or lease." Thus, under RCW 19.190.010(3), a text message promotes a business' services where it aims to contribute to the growth or prosperity of said business.[10]

Here, CRST sent the text messages at issue to recruit the message recipients to join its network of independent contractors that CRST relies on to provide delivery and installation services that it sells to retailer and manufacturer clients. CRST markets the size and geographic reach of its independent contractor network and assesses its

---

[9] Because CRST provides no substantive argument to support its assertion that a broad interpretation of subsection (3) is likely unconstitutional, we do not address it. See King County Dep't of Adult & Juv. Det. v. Parmelee, 162 Wn. App. 337, 353, 254 P.3d 927 (2011); RAP 10.3(a)(6).

[10] The parties do not dispute that CRST is a business that sells delivery installation and services. See Wash. Ct. of Appeals oral arg., Aaland v. CRST Home Solutions, LLC, No. 86708-3-I (June 12, 2025), at 9 min., 07 sec. through 10 min., 16 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025061174/. Therefore, the precise scope of "for sale or lease" under RCW 19.190.010(3) or "business" under RCW 19.190.060 is not at issue here.

competitive advantage based on its ability to recruit quality contractors, including assessing recruiters' performance based on the number of contractors that they onboard. The record thus establishes that CRST sent text messages to Aaland and class members to recruit contractors to contribute to its continued commercial success and growth. Accordingly, we hold that CRST's text communication falls within the scope of a "commercial electronic text message" as defined by the plain and unambiguous language of RCW 19.190.010(3).

Because subsection (3) is not ambiguous, we need not review legislative history to determine the legislature's intent. See Brown, slip op. at 17. The legislative intent underlying subsection (3) is demonstrated by the provision's plain meaning.

Citing RCW 19.86.920,[11] CRST asserts that courts should be guided by federal court decisions when interpreting issues related to CPA violations. At the same time CRST concedes[12] that federal courts' interpretations of state laws are merely persuasive and not binding. See id. at 5; see also Klem v. Wash. Mut. Bank, 176 Wn.2d 771, 787, 295 P.3d 1179 (2013) ("Although we have been guided by federal interpretations, Washington has developed its own jurisprudence regarding application of Washington's CPA.").

---

[11] RCW 19.86.920 states in relevant part:
> The legislature hereby declares that the purpose of this act is to complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition. It is the intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts and final orders of the federal trade commission interpreting the various federal statutes dealing with the same or similar matters.

[12] Wash. Ct. of Appeals oral arg., supra, at 15 min., 11 sec. through 15 min., 25 sec.

CRST devotes a large portion of its response brief to a discussion of various federal court decisions to support its argument that a text message must be sent to facilitate a sale. We are not persuaded.

First, as CRST conceded at oral argument,[13] none of the federal decisions that CRST cites that address CEMA's prohibition against unsolicited commercial text messages engage in a plain language interpretation of the definition of a commercial text message under RCW 19.190.010(3).[14]

Second, we decline CRST's invitation to rely on as persuasive authority federal cases that address issues specific to the federal Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, and the Washington Automatic Dialing and Announcing Device Act (WADAD), chapter 80.36 RCW. Again, the federal decisions that CRST proffers to establish that CEMA and TCPA or WADAD are substantially similar statutes do not engage in a comparative analysis of the two statutes' relevant plain language.[15] Such superficial treatment cannot supplant a Washington court's plain language

---

[13] Wash. Ct. of Appeals oral arg., <u>supra</u>, at 15 min., 26 sec. through 15 min., 54 sec.

[14] <u>See</u> <u>Dawson v. Porch.com</u>, No. 2:20-CV-00604-RSL, 2024 WL 4765159, at *10 (W.D. Wash. Nov. 13, 2024) (court order); <u>Walker-Schaut v. Lido Labs Holding Co.</u>, No. C23-5944 BHS, 2024 WL 2702007, at *2-3 (W.D. Wash. May 24, 2024) (court order) (citing <u>Bottoms v. Block, Inc.</u>, No. 23-1969 MJP, 2024 WL 1931690, at *6 (W.D. Wash., May 2, 2024) (court order)); <u>Barton v. Walmart Inc.</u>, No. 23-5063 DGE-RJB, 2024 WL 1533579, at *9 (W.D. Wash. Apr. 9, 2024) (court order); <u>Moore v. Robinhood Financial LLC</u>, No. 2:21-CV-01571-BJR, 2022 WL 3082969, at *5 (W.D. Wash. Aug. 3, 2022) (court order); <u>Wick v. Twilio Inc.</u>, No. C16-00914RSL, 2017 WL 2964855, at *5 (W.D. Wash. July 12, 2017) (court order); <u>Wright v. Lyft, Inc.</u>, No. 2:14-CV-00421 MJP, 2016 WL 7971290, at *5 (W.D. Wash. Apr. 15, 2016) (court order); <u>Gragg v. Orange Cab Co.</u>, No. C12-0576 RSL, 2013 WL 195466, at *4 (W.D. Wash. Jan. 17, 2013) (court order); <u>Hickey v. Voxernet LLC</u>, 887 F. Supp. 2d 1125, 1132 (W.D. Wash. 2012).

[15] <u>See</u> <u>Wick</u>, 2017 WL 2964855, at *5 (citing, e.g., <u>Gragg</u>, 2013 WL 195466, at *3-4, 4 n.4); <u>Walker-Schaut</u>, 2024 WL 2702007, at *2-3.

interpretation of Washington law.[16] See Young v. Toyota Motor Sales, U.S.A., 196 Wn.2d 310, 319, 472 P.3d 990 (2020) ("[W]hen Washington law is different from its federal counterpart, we give effect to Washington law.").

Finally, we observe that CRST's attempted comparison[17] of CEMA's language to WADAD is not persuasive. The relevant provision of WADAD prohibits the use of auto dialers "for purposes of commercial solicitation," RCW 80.36.400(2), defined as "the unsolicited initiation of a telephone communication made for the purpose of encouraging a person to purchase property, goods, or services, or wrongfully obtaining anything of value." RCW 80.36.400(1)(c) (emphasis added).

WADAD was enacted before CEMA and thus was in place when the legislature amended CEMA in 2003 to add the prohibition against unsolicited commercial text messages under RCW 19.190.060. See LAWS OF 1986, ch. 281, § 2 (WADAD); LAWS OF 1998, ch. 149, § 1 (CEMA), LAWS OF 2003, ch. 137, § 1 (amendment). Because we

---

[16] For this same reason, the federal decisions that CRST cites that solely analyze issues under the TCPA are unpersuasive. See Reardon v. Uber Technologies, Inc., 115 F. Supp. 3d 1090, 1093-97 (N.D. Cal. 2015); Risher v. Adecco Inc., No. 19-CV-05602-RS, 2020 WL 13505422, at *3-4 (N.D. Cal. Feb. 14, 2020) (court order); Jeffrey Katz Chiropractic, Inc. v. Tivity Health Support, LLC, No. 18-CV-05400-RS, 2019 WL 7822518, at *1-2 (N.D. Cal. Mar. 11, 2019) (court order); True Health Chiropractic Inc. v. McKesson Corp., No. 13 -CV-02219-HSG, 2022 WL 1239346, at *2, 4-5 (N.D. Cal. Apr. 27, 2022), aff'd, No. 22-15710, 2023 WL 7015279 (9th Cir. Oct. 25, 2023) (court order), rev'd and remanded on other grounds sub nom. McLaughlin Chiropractic Assoc. v. McKesson Corp., 606 U.S. 146, 145 S. Ct. 2006, 222 L. Ed. 2d 405 (2025); Physicians Healthsource, Inc. v. Masimo Corp., No. SACV14-00001JVS(ADSx), 2020 WL 5260650, at *4 (C.D. Cal. June 13, 2020) (court order); Murphy v. DCI Biologicals Orlando, LLC, No. 6:12-CV-1459-ORL-36KRS, 2013 WL 6865772, at *10 (M.D. Fla. Dec. 31, 2013) (court order); Friedman v. Torchmark Corp., No. 12-CV-2837-IEG (BGS), 2013 WL 4102201 (S.D. Cal. Aug. 13, 2013) (court order); Lutz App. Svcs., Inc. v. Curry, 859 F. Supp. 180, 181-82 (E.D. Pa. 1994); see also Chesbro v. Best Buy Stores, L.P., 705 F.3d 913, 919 (9th Cir. 2012) (holding that WADAD is substantially similar to TCPA).

[17] In support, CRST cites Gragg, 2013 WL 195466, at *4, wherein the federal district court concluded that "despite the differences in word choice," CEMA and WADAD "regulate communications that promote or encourage commercial transactions."

presume that the legislature enacts laws with full knowledge of existing laws, <u>Thurston County v. Gorton</u>, 85 Wn.2d 133, 138, 530 P.2d 309 (1975), we conclude that the legislature's use of "promote" rather than "encourage" in its definition of a prohibited "commercial electronic text message" under RCW 19.190.010(3) was intentional and that the words have different meanings. <u>See</u> <u>State v. Flores</u>, 164 Wn.2d 1, 14, 186 P.3d 1038 (2008) ("[W]hen the legislature uses different words in statutes relating to a similar subject matter, it intends different meanings."). Therefore, CRST's cited federal decisions that are specific to a "commercial solicitation" under WADAD are not helpful in considering claims brought under the plain language of RCW 19.190.010(3).[18]

In sum, we hold that CEMA plainly defines commercial text messages under RCW 19.190.010(3) as encompassing text messages sent to further the growth or prosperity of a business. We conclude that the text messages sent by CRST to recruit independent contractors to contribute to the growth and financial success of its delivery and installation service network constitute commercial text messages within the scope of CEMA's prohibition. <u>See</u> RCW 19.190.060. Therefore, the trial court erred by granting summary judgment to CRST.

Though the reversal of a trial court's order granting summary judgment to one party does not mean that the other party's motion for summary judgment must be granted, this can be an appropriate remedy where the two motions take diametrically

---

[18] <u>See</u> <u>Spafford v. Echostar Commc'ns Corp.</u>, 448 F. Supp. 2d 1220, 1223-24 (W.D. Wash. 2006); <u>Hartman v. United Bank Card, Inc.</u>, No. C11-1753JLR, 2013 WL 12120424, at *4 (W.D. Wash. Jan. 2, 2013) (court order); <u>Kalmbach v. Nat'l Rifle Ass'n of Am.</u>, No. CI7-399-RSM, 2017 WL 3172836, at *4 (W.D. Wash. July 26, 2017) (court order); <u>Chesbro</u>, 705 F.3d at 919.

opposite positions on the dispositive legal issue and raise no issues of fact. Spahi v. Hughes-Nw., Inc., 107 Wn. App. 763, 776-77, 27 P.3d 1233 (2001).

In this case, the material facts have been fully developed and are not in dispute. The parties agreed and filed competing summary judgment motions below on the sole dispositive legal question of whether the text messages that CRST sent to Aaland and the class are "commercial" as defined under CEMA to violate RCW 19.190.060. See RCW 19.190.010(3). We thus reverse the trial court's order granting summary judgment to CRST and remand for the trial court to enter summary judgment in favor of Aaland and the class, notwithstanding the need for proceedings to further address the amount of damages.[19]

## Attorney Fees

Aaland contends that he is entitled to attorney fees and costs under RCW 19.86.090 of the CPA at the trial court level and on appeal. RAP 18.1 authorizes a party to request reasonable attorney fees on appeal if an applicable law grants the party the right to recover. Under RCW 19.86.090, a party who prevails under the CPA is entitled to attorney fees and costs, which may apply to appeals. Mora v. MacGilvary, 19 Wn. App. 2d 260, 279, 495 P.3d 850 (2021). Because CRST violated CEMA's prohibition against unsolicited text messages and, in turn, the CPA, we award attorney fees on appeal. See Wright, 189 Wn.2d at 728-32; Brown, slip op. at 14; RCW 19.190.060, .040, .100. On remand, the trial court should determine the amount of fees and expenses reasonably incurred in this appeal.

---

[19] Under CEMA's liquidated damages provision RCW 19.190.040, "[d]amages to the recipient of a … commercial electronic text message sent in violation of this chapter are five hundred dollars, or actual damages, whichever is greater." RCW 19.190.040(1); see Wright, 189 Wn.2d at 729, 731 (discussing RCW 19.190.040).

CONCLUSION

We reverse the trial court's orders granting summary judgment to CRST and dismissing Aaland's class action with prejudice. We remand for the trial court to enter summary judgment in favor of Aaland and the class and to hold further proceedings to determine the amount of damages and to award reasonable attorney fees at the trial court level and on appeal.

_Cohen, J._

WE CONCUR:

_Feldman, J._